UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| GREGORIO LOPEZ, | * | |
| | * | |
| Petitioner, | * | |
| | * | |
| v. | * | Civil Action No. 17-cv-11147-ADB |
| | * | |
| SEAN MEDEIROS, | * | |
| | * | |
| Respondent. | * | |
| | * | |

**MEMORANDUM AND ORDER ON PETITION FOR A WRIT OF HABEAS CORPUS**

BURROUGHS, D.J.

On June 1, 2011, Petitioner Gregorio Lopez ("Petitioner") was sentenced to life in prison after a Suffolk Superior Court jury found him guilty of first-degree murder. [ECF No. 1]. Currently before the Court is Petitioner's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. [Id.]. Petitioner challenges his conviction on two grounds, claiming that there was (1) a Due Process violation in connection with the trial judge's refusal to permit Petitioner to offer testimony that he claims was relevant and probative ("Ground One"); and (2) a Due Process violation for alleged prosecutorial misconduct during closing arguments ("Ground Two"). [Id. at 2].[1] For the reasons set forth below, the petition, [ECF No. 1], is DENIED.

**I.    FACTUAL AND PROCEDRUAL BACKGROUND**

In reviewing a habeas petition from an individual in custody pursuant to the judgment of a state court, a determination of a factual issue made by the state court shall be presumed to be

---

[1] On April 23, 2018, Petitioner filed a motion to amend his petition to eliminate a third ground for relief based on a challenge to the Commonwealth's failure to require evidence of state of mind for defendants charged with first degree murder on a theory of extreme atrocity or cruelty. [ECF No. 26].

correct and "can be rebutted only by clear and convincing evidence to the contrary." 28 U.S.C. § 2254(e)(1); RaShad v. Walsh, 300 F.3d 27, 35 (1st Cir. 2002) (quoting Ouber v. Guarino, 293 F.3d 19, 27 (1st Cir. 2002)).

The Massachusetts Supreme Judicial Court ("SJC") provided an account of the facts as the jury could have found them, which is reproduced in relevant part below.

> [Petitioner] was staying with his girl friend, Desirae Ortiz, in one bedroom of a five-bedroom apartment . . . in the Jamaica Plain section of Boston. Four additional people lived in the apartment, each renting a separate bedroom. . . . Insofar as relevant here, Ortiz lived, and [Petitioner] stayed, in one bedroom, Jenicelee Vega lived in another bedroom, Moises Rivera lived in a third bedroom, and Gricelle Alvarado and her infant son lived in a fourth bedroom. . . . [Petitioner], Ortiz, Vega, Rivera, and Alvarado were all home the morning of the murder.
>
> [Petitioner] and Ortiz met during the winter of 2008–2009 and [Petitioner] began to stay frequently with Ortiz . . . beginning shortly after February, 2009. Before dating [Petitioner], Ortiz had had a relationship with the victim. . . . They were no longer dating at the time of the murder. However, Ortiz would speak with the victim in the months prior to the murder using the telephone at the house of their mutual friend. [Petitioner] had knowledge of Ortiz's prior relationship with the victim but did not know that she was speaking recently to the victim on the telephone.
>
> . . .
>
> At approximately 1 a.m. on March 11, 2009, Alvarado heard "loud banging" at the front door. She was in bed at the time. At first she tried to ignore the banging, but as it continued, she answered the door. She looked through the peephole of the front door and recognized the victim as Ortiz's boy friend. It had been a while but she had seen the victim at the apartment before. . . . Alvarado opened the door and told the victim that she did not know whether Ortiz was at the apartment or if she were sleeping. The victim told Alvarado that Ortiz was expecting him. Alvarado responded, "Well if she's expecting you, then you know what room is hers." She did not show the victim to Ortiz's room but she saw him walk through the kitchen in the direction of Ortiz's bedroom. She then returned to her bedroom.
>
> [Petitioner] and Ortiz were asleep. Ortiz was awakened by a knock on her bedroom door and the sound of the bedroom door opening. At first, she did not know who it was. She got up and walked toward the door, and realized that it was the victim. Ortiz was not expecting him that night. The victim forced himself into Ortiz's bedroom and Ortiz turned on the light. As Ortiz turned on the light, the victim saw [Petitioner] in the bed, naked. The victim, shocked by the presence of [Petitioner], threatened him. The victim said "he was going to blow his head off." The victim

said that Ortiz was his "wife." [Petitioner] did not respond. Ortiz did not see the victim with a weapon, nor did she see him hit [Petitioner]. At this point, Ortiz wanted the victim to leave, so she told [Petitioner] that she was going to speak to the victim outside. Ortiz left her cellular telephone in the bedroom. She and the victim proceeded to the landing outside the front door of the apartment, shutting the door behind them. [Petitioner] remained in the bedroom. The victim and Ortiz were on the landing for approximately forty-five minutes. Ortiz and the victim did not shout, yell, or argue.

Meanwhile, at 1:35 a.m., Vega awoke when her cellular telephone rang. The caller identification indicated that the call was from Ortiz's cellular telephone. When Vega answered her cellular telephone, [Petitioner] was speaking. [Petitioner] said that there was an emergency and asked Vega to come to Ortiz's bedroom. Vega went to Ortiz's bedroom where [Petitioner] appeared "really upset." [Petitioner] told Vega that Ortiz was outside with her former boy friend and that the former boy friend showed him a gun. He asked Vega to take him up the street to get a gun. Vega refused and told him that she did not want to become involved. Vega left Ortiz's bedroom and did not see [Petitioner] leave the apartment. Because she sensed something was going to happen, Vega went to Alvarado's bedroom and told her to get her son and leave the apartment.

At approximately 1:51 a.m., while she was in Alvarado's bedroom, Vega received another telephone call from [Petitioner], who was still using Ortiz's cellular telephone. He told her that he was around the corner. At one point while [Petitioner] was not there, Alvarado became "curious" so she went to look through the peephole of the front door. She saw Ortiz and the victim on the landing. She then returned to her bedroom. At approximately 2:05 a.m., Vega received a third telephone call from [Petitioner]. He told Vega to tell the "guy" not to go anywhere and that he was on his way. After the telephone calls, Vega went back to her room while Alvarado continued to get ready to leave the apartment. A short time later, Vega saw [Petitioner] enter the house through the back door. She saw a "long, brown" gun in his hand that looked like a shotgun. Alvarado saw [Petitioner] walking down the hallway with a gun that looked like a rifle. When she saw [Petitioner], Alvarado yelled at him to "stop, hold on" and to allow her and her son to leave. At this time, [Petitioner] was standing about two feet away from the front door. [Petitioner] responded, "Go ahead, go get your little man."

Alvarado returned to her bedroom, picked up her son, and started to walk toward Vega's bedroom, walking past [Petitioner]. Alvarado knocked on Vega's bedroom door and as Vega opened the door, she saw [Petitioner] with his hand on the doorknob, looking through the peephole of the front door. While [Petitioner] was looking through the peephole, Vega did not hear fighting or shouting coming from the landing. As Alvarado was entering the room and before Vega closed the door, Alvarado heard the front door open and she looked back to see [Petitioner] raise the gun and shoot the victim. She did not see anything in the victim's hands at the time he was shot. Ortiz, still on the landing, saw [Petitioner] open the door and shoot the victim without saying a word. Ortiz yelled, "No, Mikey, no," and, "[W]hy did

3

> you do this to me?"  The victim fell to the floor.  Rivera was walking to his bedroom door to go to the bathroom when he heard a "very loud" gunshot.  He did not hear arguing or shouting prior to hearing the gunshot. . . .  [H]e opened the door and saw the hands and shoes of the victim on the landing, [Petitioner] at the front door, and Ortiz in the hallway.
>
> Rivera then saw [Petitioner] pull the victim to the floor and begin to kick and curse at him.  [Petitioner] walked toward Ortiz's bedroom and then returned to the landing.  [Petitioner] began to grunt at the victim.  Rivera then saw [Petitioner] leave the landing, return, and kick the victim again.  Ortiz also testified that [Petitioner] returned to the landing three times, each time kicking and cursing the victim.  [Petitioner] then left the apartment through the back door.  While leaving, he told Ortiz that he was trying to protect her.
>
> . . .
>
> Alvarado, while still in Vega's room, telephoned 911, as did Rivera.  When the police arrived, about five to ten minutes after the shooting, the victim was on the floor of the landing with a large gunshot wound to his lower right chest area.  The victim also had small abrasions on his forehead and chin.  The victim was pronounced dead at the scene between 2:15 a.m. and 2:30 a.m.  The cause of death was determined to be a shotgun wound to the torso, with injuries to the liver, gallbladder, bowel, pancreas, aorta, and inferior vena cava.

Commonwealth v. Lopez, 53 N.E.3d 659, 662–64 (Mass. 2016).

On May 15, 2009, a Suffolk County grand jury indicted Petitioner on charges of murder in violation of Mass. Gen. Laws ch. 265, § 1, and unlawful possession of a firearm, in violation of Mass. Gen. Laws ch. 269, § 10(a).  [ECF No. 16 ("Supp.") at 1, 3].  Petitioner's trial began on May 23, 2011.  [Id. at 7].  On June 1, 2011, a Suffolk County Superior Court jury found Petitioner guilty of murder in the first degree on a theory of deliberate premeditation and extreme atrocity or cruelty, and not guilty of possession of a firearm without a license.  [Id.].  Petitioner was sentenced to life in prison.  [Id.].  He appealed his conviction to the SJC, which affirmed the conviction on July 8, 2016.  Lopez, 53 N.E.3d 659.

On June 19, 2017, Petitioner filed both a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 and a motion to stay.  [ECF Nos. 1, 3].  Petitioner moved to stay this case to allow him time to file a collateral post-conviction motion for a new trial in Suffolk Superior

Court, which was necessary for him to exhaust an unasserted state law claim of ineffective assistance of counsel. [ECF No. 3]. The Court denied the motion, giving Petitioner the option to either dismiss his petition in its entirety or move forward with his petition only as to the exhausted claims. [ECF No. 17 at 5]. On December 18, 2017, in response to the Court's request for a status report on its Order on the motion to stay, Petitioner filed notice of his intent to move forward solely on his exhausted claims. [ECF No. 19]. On April 23, 2018, Petitioner filed a memorandum in support of his petition, [ECF No. 28], and on June 29, 2018, Respondent filed his opposition, [ECF No. 32].

## II.     LEGAL STANDARD

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), a federal court may grant habeas relief on claims previously adjudicated on the merits only after the petitioner has exhausted all available state remedies. 28 U.S.C. § 2254(b)–(c); see O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999) (noting that Section 2254(c) requires that state prisoners give state courts a fair opportunity to review their claims and correct alleged constitutional violations before review by a federal court). Assuming that the exhaustion requirement has been satisfied, the AEDPA permits habeas relief only if the previous adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A state court decision is "contrary to" clearly established Supreme Court precedent if the state court arrives at a conclusion contrary to that reached by the Supreme Court on a question of law, or if the court decides a case differently from a decision of the Supreme Court on a

materially indistinguishable set of facts.  Williams v. Taylor, 529 U.S. 362, 404–05 (2000).  A state court unreasonably applies federal law when it "correctly identifies the governing legal principles, but (i) applies those principles to the facts of the case in an objectively unreasonable manner; (ii) unreasonably extends clearly established legal principles to a new context where they should not apply; or (iii) unreasonably refuses to extend established principles to a new context where they should apply."  Gomes v. Brady, 564 F.3d 532, 537 (1st Cir. 2009) (citation omitted).  An unreasonable application requires "some increment of incorrectness beyond error." Norton v. Spencer, 351 F.3d 1, 8 (1st Cir. 2003) (citation omitted).  A petitioner must show that the state court decision applied clearly established law in a way that was "objectively unreasonable."  Sanchez v. Roden, 753 F.3d 279, 299 (1st Cir. 2014) (quoting White v. Woodall, 572 U.S. 415, 419 (2014)).

Thus, to obtain habeas relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement."  Harrington v. Richter, 562 U.S. 86, 103 (2011).  "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  Estelle v. McGuire, 502 U.S. 62, 68 (1991) (citing 28 U.S.C. § 2241).  "Errors based on violations of state law are not within the reach of federal habeas petitions unless there is a federal constitutional claim raised."  Kater v. Maloney, 459 F.3d 56, 61 (1st Cir. 2006) (citing Estelle, 502 U.S. at 67–68).  "'[T]he gap between erroneous state court decisions and unreasonable ones is narrow,' and 'it will be the rare case that will fall into this gap . . . .'"  O'Laughlin v. O'Brien, 568 F.3d 287, 299 (1st Cir. 2009) (quoting Evans v. Thompson, 518 F.3d 1, 6 (1st Cir. 2008)).

The AEDPA presumes that the state court's factual findings are correct and requires rebuttal by the petitioner with "clear and convincing evidence." 28 U.S.C. § 2254(e)(1); see Cullen v. Pinholster, 563 U.S. 170, 181 (2011) ("The petitioner carries the burden of proof."); see also Linton v. Saba, 812 F.3d 112, 116 (1st Cir. 2016) ("We must accept the state court findings of fact unless convinced by clear and convincing evidence that they are in error." (internal citation and punctuation omitted)). The factual findings include "'basic, primary, or historical facts,' such as witness credibility and recitals of external events." Sleeper v. Spencer, 510 F.3d 32, 38 (1st Cir. 2007) (quoting Sanna v. DiPaolo, 265 F.3d 1, 7 (1st Cir. 2001)).

## III. DISCUSSION

### A. Ground One: Trial Court's Exclusion of Evidence Relating to Victim and Petitioner's Due Process Right to Present a Defense

As Ground One for relief, Petitioner states that the trial judge's decision to exclude evidence of the victim's history of violence against Ortiz violated Petitioner's Sixth Amendment right to mount a defense. [ECF No. 28 at 12]. Respondent argues that the SJC appropriately applied Supreme Court precedent in rejecting Petitioner's argument because Petitioner had failed to make a sufficient proffer of evidence about the victim's alleged history of violence. [ECF No. 32 at 11].

The Supreme Court has "looked to the specific guarantees of the Sixth Amendment to determine whether a state criminal trial was conducted with due process of law." Washington v. Texas, 388 U.S. 14, 18 (1967). "The right of an accused in a criminal trial to due process is, in essence, the right to a fair opportunity to defend against the State's accusations." Chambers v. Mississippi, 410 U.S. 284, 294 (1973). "The right to present relevant testimony," however, "is not without limitation. The right 'may, in appropriate cases, bow to accommodate

7

other legitimate interests in the criminal trial process.'" Michigan v. Lucas, 500 U.S. 145, 149, (1991) (quoting Rock v. Arkansas, 483 U.S. 44, 55 (1987)).

> [S]tate and federal rulemakers have broad latitude under the Constitution to establish rules excluding evidence from criminal trials. Such rules do not abridge an accused's right to present a defense so long as they are not "arbitrary" or "disproportionate to the purposes they are designed to serve." . . . Moreover, [the Supreme Court] ha[s] found the exclusion of evidence to be unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused.

United States v. Scheffer, 523 U.S. 303, 308 (1998) (quoting Rock, 483 U.S. at 56) (internal citations omitted).

Here, the Massachusetts rule at issue involves relevant testimony in support of a claim of self-defense or defense of another. As outlined by the SJC, the rule provides that, "where evidence in a homicide case could raise a reasonable doubt that a defendant acted in defense of himself, the defendant should be allowed to prove that at the time of the killing he knew of specific violent acts *recently* committed by the victim." Commonwealth v. Fontes, 488 N.E.2d 760, 762 (Mass. 1986) (emphasis added). "The incidents must not be remote (a discretionary matter for the trial judge) and other competent evidence must raise the question whether the defendant may have acted justifiably in his own defense." Id. at 763; see Lopez, 53 N.E.3d at 665 (citing and applying Fontes, 488 N.E.2d at 763). This evidence can be introduced in support of a defendant's claim of self-defense or defense of another. See Commonwealth v. Johnson, 589 N.E.2d 311, 313 (Mass. 1992) (citing support for the proposition that a justification for defense of another is coextensive with the right of self-defense).

In its opinion denying Petitioner's appeal, the SJC stated that the trial judge refused to admit defense counsel's proffer of evidence of the victim's prior acts of violence against Ortiz because "he concluded that the evidence was irrelevant in the absence of evidence of sufficient provocation, self-defense, or defense of another." Lopez, 53 N.E.3d at 665. The SJC first found

that trial counsel's proffer was insufficient because he did not provide the trial court with information about "when in time the prior acts of violence took place in relation to the murder, nor did he provide any details as to specific incidents." Id. In addition, the SJC observed that, "even if the proffer were sufficient, there was insufficient evidence that [Petitioner] acted justifiably in his own defense," in defense of another, or in support of a voluntary manslaughter instruction based on provocation. Id. at 666–67. As a result, the SJC held that evidence of the victim's past violence towards Ortiz would have been irrelevant. Id. at 667.[2]

---

[2] The SJC reviewed the elements required under these three theories and found that Petitioner failed to meet the elements of each. Lopez, 53 N.E.3d at 666–67. As to self-defense, a defendant must show that he

> (1) had reasonable ground to believe and actually did believe that he was in imminent danger of death or serious bodily harm, from which he could save himself only by using deadly force, (2) had availed himself of all proper means to avoid physical combat before resorting to the use of deadly force, and (3) used no more force than was reasonably necessary in all of the circumstances of the case.

Id. (quoting Commonwealth v. Harrington, 399 N.E.2d 475, 479 (Mass. 1980)). As the SJC observed, after the victim's initial verbal threat, the victim and Ortiz stood outside talking for forty-five minutes. Id. During this time, Petitioner could have called the police or fled in order to avoid using deadly force, but instead, Petitioner used that time to make several phone calls, speak with other individuals living in the apartment, and leave the apartment to retrieve a gun. Id. at 666. The SJC therefore held that Petitioner failed to meet the required elements of self-defense. Id.

Defense of another requires a defendant to show that "(a) a reasonable person in the actor's position would believe his intervention to be necessary for the protection of the third person, and (b) in the circumstances as that reasonable person would believe them to be, the third person would be justified in using such force to protect himself." Lopez, 53 N.E.3d at 666 (quoting Commonwealth v. Martin, 341 N.E.2d 885, 891 (Mass. 1976)). The SJC stated that the only threat in evidence was one made to Petitioner, not Ortiz. Id. Multiple witnesses—residents of the apartment where the shooting took place—stated that they did not hear evidence of an argument between the victim and Ortiz while they were talking outside. Id. at 667. The SJC therefore held that Petitioner failed to meet these elements because a reasonable person would not have believed intervention, let alone through force, was necessary. Id.

Lastly, the SJC held that there was insufficient evidence of provocation to support a voluntary manslaughter instruction, as such an instruction requires evidence "to cause the accused to lose

"Plainly referring to rules of this type," the Supreme Court has "stated that the Constitution permits judges to exclude evidence that is . . . only marginally relevant or poses an undue risk of . . . confusion of the issues." Holmes v. South Carolina, 547 U.S. 319, 326–27 (2006) (internal quotation marks and citation omitted). "Such rules do not abridge an accused's right to present a defense so long as they are not 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" Scheffer, 523 U.S. at 308 (quoting Rock, 483 U.S. at 56). Here, the Massachusetts rule at issue was not arbitrary or disproportionate to its purposes where the rule allowed the trial court to exclude evidence of the victim's history of violence after Petitioner's counsel failed to provide details about those incidents, including when they took place, and where other competent evidence did not support these theories. See id.

Accordingly, having failed to show that the SJC applied Supreme Court precedent "in an objectively unreasonable manner," Petitioner is not entitled to relief on this ground. Gomes, 564 F.3d at 537.

### B.     Ground Two: Prosecution's Closing Argument and Petitioner's Due Process Rights

As Ground Two for relief, Petitioner claims that the prosecution made improper references to excluded evidence about the victim's alleged history of violence towards Ortiz during closing arguments, in violation of Petitioner's Due Process rights. [ECF No. 28 at 13]. Respondent maintains that this claim is unexhausted and therefore inappropriate for habeas

---

his self-control in the heat of passion" such that "the killing followed the provocation before sufficient time had elapsed for the accused's temper to cool." Lopez, 53 N.E.3d at 667 (quoting Commonwealth v. Colon, 866 N.E.2d 412, 425 (Mass. 2007)). Again, forty-five minutes elapsed between the time that the victim first entered the bedroom where Petitioner and Ortiz were sleeping and when Petitioner shot the victim. Id. The SJC held that because Petitioner had ample time to cool off and left "the scene of the provocation," a voluntary manslaughter instruction was not appropriate. Id. (quoting Commonwealth v. Keohane, 829 N.E.2d 1125, 1130 (Mass. 2005)).

review by this Court because Petitioner only raised this issue as a state law claim before the SJC. [ECF No. 32 at 16].

Petitioner concedes (as he did before the SJC) that the prosecutor did not actually reference this excluded evidence. [ECF No. 28 at 29–30]; see [Supp. at 45 (Petitioner's brief before the SJC, acknowledging no direct reference to excluded evidence)]; Lopez, 53 N.E.3d at 668 (stating that Petitioner "concedes that the prosecutor never made a direct reference to the excluded evidence"). However, Petitioner believes that by referencing his motive for killing the victim, "the prosecutor took unfair advantage of the absence of the excluded evidence," [ECF No. 28 at 30], presumably because the jury was unable to consider that Petitioner shot the victim out of concern for Ortiz's safety.

In reviewing this claim, the SJC held that these statements were not improper because "[t]he prosecutor was merely drawing reasonable inferences and conclusions from the evidence." Lopez, 53 N.E.3d at 668 (citing Commonwealth v. Fitzgerald, 381 N.E.2d 123 (Mass. 1978)). Even if improper, the SJC held that the statements did not require reversal where the "statements were inconsequential in the face of the overwhelming evidence of deliberate premeditation." Id. at 669. The SJC did not reference a Due Process claim, cite to federal law, or otherwise indicate that it was performing a Due Process analysis on Petitioner's claim. See id. at 667–69.

"The exhaustion requirement" stems from the idea that "as a matter of comity, federal courts should not consider a claim in a habeas corpus petition until after the state courts have had an opportunity to act." Conningford v. Rhode Island, 640 F.3d 478, 482 (1st Cir. 2011) (quoting Rose v. Lundy, 455 U.S. 509, 515 (1982)). A claim for habeas relief is exhausted if it has been "fairly and recognizably" presented in state court. Sanchez, 753 F.3d at 294 (quoting Casella v. Clemons, 207 F.3d 18, 20 (1st Cir. 2000)). In other words, "a petitioner must have tendered his

federal claim [in state court] in such a way as to make it probable that a reasonable jurist would have been alerted to the existence of the federal question." Id. (internal quotation marks and citations omitted).

To fulfill the exhaustion requirement, a petitioner "bears a heavy burden to show that he fairly and recognizably presented to the state courts the factual and legal bases of [his] federal claim." Conningford, 640 F.3d at 482 (quoting Adelson v. DiPaola, 131 F.3d 259, 262 (1st Cir. 1997)); see also Scarpa v. Dubois, 38 F.3d 1, 6 (1st Cir. 1994) ("In order to present a federal claim to the state courts in a manner sufficient to satisfy exhaustion concerns, a petitioner must inform the state court of both the factual and legal underpinnings of the claim."). "[A] petitioner can successfully claim that he has presented the same legal theory to the state court . . . [by] citing a specific provision of the Constitution; presenting the substance of a federal constitutional claim in such a manner that it 'must have been likely to alert the court to the claim's federal nature'; reliance on federal constitutional precedents; and claiming 'a particular right specifically protected by the Constitution.'" Dougan v. Ponte, 727 F.2d 199, 201 (1st Cir. 1984) (quoting Daye v. Attorney Gen. of N.Y., 696 F.2d 186, 192–93 (2d Cir. 1982) (en banc)).

Petitioner argues that he raised a Due Process claim regarding the prosecution's closing statement with the SJC, but that the court failed to address this federal claim. [ECF No. 28 at 33 (citing brief to the SJC at 16)]. However, Petitioner made a Due Process argument within the context of his claim that the trial judge improperly excluded evidence of the victim's prior violence, rather than within the context of his argument about the prosecution's closing statements. [Supp. at 32 (page 16 of Petitioner's brief to the SJC, which begins a section on his claim regarding the exclusion of evidence); id. at 44 (page 28 of Petitioner's brief to the SJC, which begins a section on his claim regarding prosecution's closing statements)]. The section of

Petitioner's appellate brief discussing the prosecution's closing statements does not reference Due Process, cite to federal caselaw, or otherwise serve to alert the SJC to the substance of a Due Process claim.  See [id. at 44–46].

One case cited by Petitioner in support of his claim, Commonwealth v. Grimshaw, 590 N.E.2d 681 (Mass. 1992), does reference a prosecutor's closing arguments but does not, as Petitioner argues, do so within the context of a Due Process claim, [ECF No. 28 at 33 (stating that Grimshaw "discusses the constitutional implications of when the prosecutor calls the jury's attention to the absence of evidence excluded at the [C]ommonwealth's request")].  The other cases cited in his appellate brief also do not discuss a Due Process claim in the context of a prosecutor's closing statement.  See [Supp. at 44–46 (citing Commonwealth v. Carroll, 789 N.E.2d 1062 (Mass. 2003); Commonwealth v. Bohannon, 378 N.E.2d 987 (Mass. 1978); Commonwealth v. Burke, 369 N.E.2d 451 (Mass. 1977); Commonwealth v. Mosby, 413 N.E.2d 754 (Mass. App. Ct. 1980)].  Petitioner has cited these same cases before this Court in support of his claim.  [ECF No. 28 at 30].  Having failed to cite to the Constitution or federal caselaw, or otherwise identify a Due Process claim, Petitioner did not "fairly and recognizably present[] to the state courts the factual and legal bases" of a Due Process claim.  Conningford, 640 F.3d at 482 (citation omitted).  This claim is therefore unexhausted.

Petitioner framed his claim to the SJC solely in terms of judicial error that implicated issues of state law.  [Supp. at 44–46].  Alleged errors grounded in state law cannot serve as a basis for habeas relief where a petitioner has failed to allege a constitutional claim.  Estelle, 502 U.S. at 67–68 ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions."); Kater, 459 F.3d at 61 ("Errors based on violations of state law are not within the reach of federal habeas petitions unless there is a federal

constitutional claim raised." (citing Estelle, 502 U.S. at 67–68)).  Petitioner is therefore not entitled to habeas relief on this ground.

## IV.     CONCLUSION

Accordingly, Petitioner's petition for a writ of habeas corpus, [ECF No. 1], is DENIED. "The district court must issue or deny a certificate of appealability when it enters a final order adverse to" a habeas petitioner.  Rules Governing Section 2254 Cases, R. 11(a).  The Court declines to grant a certificate of appealability.

**SO ORDERED.**

September 10, 2020                                                                   /s/ Allison D. Burroughs
                                                                                               ALLISON D. BURROUGHS
                                                                                               U.S. DISTRICT JUDGE